# Illinois Official Reports

## Appellate Court

***People v. Sanders*, 2014 IL App (1st) 111783**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. McCLAIN SANDERS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-1783 |
| Filed | June 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's second successive postconviction petition alleging newly discovered evidence of his actual innocence of first degree murder and aggravated kidnapping arising from a narcotics transaction in which the victim "beat" defendant by selling him cocaine that was "no good" was properly dismissed, especially when the petition was based on the recanted testimony of a witness who testified in a related case and was found to be "a complete liar." |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 92-CR-22439; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Stephen L. Gentry, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha Marie Kelly, and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Fitzgerald Smith concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant McClain Sanders was convicted of first degree murder and aggravated kidnapping and sentenced to concurrent terms of 60 and 15 years in prison, respectively. Defendant now appeals from the dismissal, on motion of the State, of his second successive postconviction petition. On appeal, defendant contends that his petition should have advanced to an evidentiary hearing because he presented newly discovered evidence that established a substantial claim of actual innocence. For the reasons that follow, we conclude that the trial court properly dismissed defendant's petition.

¶ 2     The evidence at trial showed that on the evening of April 14, 1992, a group of people including the victim, Jonas Cooks, gathered at the Chicago home of Donald Barfield. Some drug transactions occurred, after which the victim was accused of "beating" or cheating the others on the deals. The victim was tied up, duct taped, placed in the trunk of a car, taken to an abandoned building, and shot. The victim, who was not found for several days, died of multiple gunshot wounds to the head. Defendant, Aaron May, Gary Bingham, and Barfield were tried separately on numerous charges arising from the victim's kidnapping and murder.

¶ 3     Donald Barfield testified that on the day in question, he was at his house with the victim, William Ramseur, Cheryl Lathan, Joe Booker, a woman named "Dee Dee," and a man named Tyrone. At some point, a group of three men, known to him only as Pork Chop, Big Red, and Little Red, came to the house. In court, Barfield identified defendant as Big Red. After conversing with the men, Barfield and the victim went out to buy cocaine. When they returned they gave the drugs to Pork Chop, whose money they had used for the purchase. Defendant, Pork Chop, and Little Red left for a while but then returned to the house as well. Pork Chop, who had a gun, asked the victim for their money back because the cocaine they received was "no good." Barfield testified that Little Red also had what "looked like a gun" and that there was a gun on the table near where defendant was sitting. The victim indicated that he would return the money, but not right away because he could not get in contact with "the guy" right at that time. Pork Chop asked Barfield to tie the victim up. Dee Dee brought Barfield some rope and electrical cords and helped Barfield tie the victim's hands and feet to a chair. Barfield

- 2 -

subsequently untied the victim's hands so he could make a telephone call, but Pork Chop snatched the phone from the victim. Pork Chop and Little Red ordered Barfield to open his back door. Pork Chop, Little Red, and defendant then forced the victim out the back door.

¶ 4     William Ramseur, who stated that he worked for Barfield selling cocaine, testified consistently with Barfield. According to Ramseur, Pork Chop, Big Red, and Little Red came to the house and discussed some "business" with Barfield. After various comings and goings, Pork Chop, Little Red, and Big Red returned to the house with guns and indicated they wanted their money back "because they had been beat." Ramseur testified that Barfield and a woman named Dee Dee tied the victim to a chair with extension cords and put a pillow case and duct tape over his face. Following further conversation with Pork Chop, Barfield determined that he had not received his cut of the money from the victim, so he told Pork Chop to take the victim and "do what you want to do with him." Barfield untied the victim and the three men took him out the back door.

¶ 5     Gary Bingham testified that his nickname was Pork Chop, defendant's nickname was Big Red, and Aaron May's nickname was Little Red, and that the three of them had a drug business together. On the day in question, Bingham and May went to Donald Barfield's house, where Bingham hoped to obtain cocaine. First, Barfield and the victim went out and returned with some rock cocaine. Then, Bingham and the victim went out to procure powder cocaine. After doing so, Bingham and the victim parted ways.

¶ 6     Bingham gave the drugs to May, who subsequently reported to Bingham that he had tried to cook the powder cocaine but it "weren't right." May also called defendant. Bingham, defendant, and May gathered in front of defendant's mother's house. Defendant went inside and returned with three handguns, which he distributed to the group so that they were each armed. The group then drove to Barfield's house. Bingham testified that they went inside, told the victim that the weight was not right, and demanded their money back. The victim acknowledged that Bingham had been shorted and said he would call his sister to try to get some money to "straighten this out," but Bingham snatched the phone out of the victim's hand. Barfield then tied the victim's hands and feet to a chair with an extension cord and duct tape. The victim's mouth was duct taped briefly, but the tape was removed when Barfield asked that the victim be allowed to talk. The victim asked Barfield to help him, but Barfield said he did not have enough money. Barfield then searched the victim's pockets. When he found some money, he accused the victim of "stuffing on" him and indicated that Bingham, May, and defendant could take the victim away.

¶ 7     According to Bingham, defendant suggested that they take the victim from Barfield's house. Bingham and defendant dragged the victim through the kitchen and out the back door, while May drove the car to the back of the house. After Barfield closed the door, May helped defendant and Bingham put the victim in the trunk. Bingham then drove to an abandoned building. While Bingham and May stood by the car, defendant picked the victim up out of the trunk, carried him inside the doorway of the building, and shot him twice.

¶ 8     On cross-examination, Bingham acknowledged that he had been convicted for the victim's murder, but had not yet been sentenced. When asked about his understanding of the possible penalties he was facing, he stated, "By I ain't the shooter, I wasn't really worried about nothing. *** By I took a bench trial, 30 years at the most." Bingham also stated that no one had "worked out no deal" with him regarding sentencing. He explained that he decided to testify because he "figured if I'm going to get sentenced, I want to get sentenced for something I did,

not something I didn't do." On redirect, Bingham reiterated that no one promised him anything or made any agreements with him in exchange for testifying.

¶ 9        Defendant testified that he knew who Bingham was because they had gone to high school together, but did not know him personally and never had any business relations with him. Defendant denied being at Barfield's house on the day in question, denied removing the victim from Barfield's house, and denied shooting the victim. He also denied being called Big Red and denied knowing that May, who was his nephew, was known as Little Red. Defendant testified that on the night in question, he was at home with his girlfriend, her friend, and the women's children. Defendant's girlfriend also testified that defendant was at home with her during the time in question.

¶ 10       The jury found defendant guilty of first degree murder and aggravated kidnapping. The trial court entered judgment on the verdict and subsequently sentenced him to concurrent terms of 60 and 15 years in prison, respectively.

¶ 11       We affirmed defendant's conviction and sentence on direct appeal. *People v. Sanders*, No. 1-94-0306 (1996) (unpublished order under Supreme Court Rule 23). In 1997, defendant filed a *pro se* postconviction petition. The trial court dismissed the petition as untimely and we affirmed the trial court's judgment. *People v. Sanders*, No. 1-97-1117 (1998) (unpublished order under Supreme Court Rule 23).

¶ 12       In 1999, defendant, through counsel, filed a successive postconviction petition. In the petition, defendant alleged that the State knowingly introduced perjured testimony from Bingham. Specifically, defendant asserted that Bingham, contrary to his testimony at trial, had testified pursuant to a deal with the State. Codefendant Aaron May raised the same claim in a petition brought pursuant to section 2-1401 of the Code of Civil Procedure. 735 ILCS 5/2-1401 (West 1998). The trial court awarded both defendant and May an evidentiary hearing, at which Bingham testified at length regarding conversations he had with a detective while in jail regarding whether, in exchange for helping identify the person who shot Bingham's brother in an unrelated case, he would receive a "deal" at trial and/or sentencing for Cook's murder. In the course of testifying, Bingham indicated that despite his belief at the time of defendant's and May's trials that he had secured two deals, one with the detective and one with assistant State's Attorneys, he testified at both trials that he had made no deals for his testimony. The detective testified, denying that he had promised to help Bingham with his murder case. Following the evidentiary hearing, the trial court denied both defendant's successive postconviction and May's section 2-1401 petition, finding the detective "a very credible witness" and Bingham "a very incredible witness." We affirmed the trial court's judgment in separate orders. *People v. May*, No. 1-00-3535 (2002) (unpublished order under Supreme Court Rule 23); *People v. Sanders*, No. 1-00-3942 (2003) (unpublished order under Supreme Court Rule 23).

¶ 13       In 2010, defendant filed an attorney-drafted pleading titled "Defendant's Verified Post-Conviction Petition," claiming newly discovered evidence of actual innocence. Defendant noted in the petition that Bingham was the only witness to testify at trial that defendant was the person who shot the victim, that no physical evidence implicated him, and that he had not confessed. Defendant then asserted that he had obtained newly discovered evidence of actual innocence, including, as relevant to the instant appeal, an assertion by Patricia DeRamus that Bingham alone took the victim out of the house, and an admission by Bingham that he alone kidnapped and killed the victim and that defendant was not present for the drug transactions that took place earlier on the day of the murder. Defendant asserted that

this evidence was not available at the time of trial and could not have been discovered earlier through due diligence. Specifically, he stated that DeRamus' life was threatened by Bingham, but "she has now overcome her fear and come forward," and that the "sworn testimony of Bingham is the first time he has admitted his perjury under oath regarding the fact that Defendant did not participate in the offense." Defendant asserted that the newly discovered evidence was of such conclusive character that it would probably change the result on retrial, as it exonerated him and would "certainly create grave doubts regarding Defendant's guilt in the mind of the trier of fact."

¶ 14    Defendant attached to the petition an affidavit executed by DeRamus. DeRamus averred in the affidavit that she was known as "DD." She stated that she, Barfield, and the victim were at Barfield's house on the day in question. Bingham came to the house, arranged a narcotics transaction with the victim, and then left the house with the victim. The victim subsequently returned to the house, followed by Bingham approximately 45 minutes later. Bingham, who was holding sandwich baggies containing white powder, stated that the cocaine was garbage and struck the victim in the head with a gun. Bingham marched the victim out the back door at gunpoint. When Bingham returned, he stated that he had killed the victim and threatened to kill "anybody at the house who told anyone what had taken place." DeRamus averred that at all times, Bingham acted alone. DeRamus further stated that she was afraid to come forward earlier because she was pregnant, had nine children, and Bingham knew where to find her. However, she had since "undergone therapy and mentoring" and realized she must come forward to clear her conscience and try to make amends for remaining silent for years.

¶ 15    Defendant also attached excerpts of Bingham's testimony at a 2007 evidentiary hearing on codefendant May's successive postconviction petition. In the excerpts, Bingham testified that when he went to Barfield's house on the day in question to purchase cocaine, the house was "full of people," including the victim, "DD," "William Ransom," and "somebody else." Bingham made his purchase, left, attempted to cook the cocaine, and then returned to the house to demand his money back. After Barfield tied and duct taped the victim, Bingham carried the victim out of the house by himself and put the victim in the trunk of his car. He then, by himself, took the victim to an abandoned building and shot him. According to Bingham's testimony, May was not present for the drug transactions, kidnapping, or killing of the victim. Bingham also testified that "the State" indicated it would work out a sentencing deal with him if he testified against May and placed May at the scene.

¶ 16    The State filed a motion to dismiss the second successive petition for postconviction relief, and defendant filed a reply. Following argument, the trial court granted the motion to dismiss. In the course of doing so, the trial court noted that it had heard Bingham's testimony at the evidentiary hearing on codefendant May's successive postconviction petition and "found the man to be a complete liar. Totally incredible and not worthy of belief."

¶ 17    On appeal, defendant contends that his successive petition should have advanced to an evidentiary hearing because he presented newly discovered evidence–namely, Bingham's testimony from May's evidentiary hearing and Patricia DeRamus's affidavit, both of which indicated Bingham alone kidnapped and killed the victim–that established a substantial claim of actual innocence. Defendant argues that Bingham's testimony was newly discovered insofar as it was a recantation that took place after trial and that DeRamus's affidavit was newly discovered because she had only recently overcome her fear of coming forward. He asserts that the trial court should have taken these pieces of evidence as true, erred in making a credibility

determination regarding Bingham's testimony, and completely failed to address DeRamus's affidavit. Defendant argues that Bingham's testimony and DeRamus's affidavit, taken as true, are of such conclusive character that they would have a reasonable probability of changing the outcome of his case on retrial, and that therefore, he has made a substantial showing of actual innocence and is entitled to an evidentiary hearing.

¶ 18     For a petitioner to be entitled to an evidentiary hearing on a successive petition, he must make a substantial showing of a constitutional violation. *People v. Lofton*, 2011 IL App (1st) 100118, ¶¶ 28, 34. Our review of the dismissal of a petition without an evidentiary hearing is *de novo*. *People v. Childress*, 191 Ill. 2d 168, 174 (2000).

¶ 19     The Post-Conviction Hearing Act (Act) contemplates the filing of only one postconviction petition. 725 ILCS 5/122-3 (West 2010). Any issues that were decided on direct appeal or in the original postconviction petition are barred by the doctrine of *res judicata*, and issues that could have been, but were not, raised in the original proceeding or original postconviction petition are waived. *People v. Davis*, 2014 IL 115595, ¶ 13; *People v. Blair*, 215 Ill. 2d 427, 443 (2005). However, a defendant may overcome these procedural hurdles to filing a successive postconviction petition in limited circumstances. *Davis*, 2014 IL 115595, ¶ 14. As relevant in the instant case, one basis for relaxing the bar against successive postconviction petitions is where a petitioner sets forth a claim of actual innocence. *People v. Ortiz*, 235 Ill. 2d 319, 329-30 (2009). Evidence supporting an actual innocence claim must be newly discovered, material, noncumulative, and of such conclusive character as would probably change the result on retrial. *Ortiz*, 235 Ill. 2d at 333. Claims of actual innocence must be supported " 'with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.' " *People v. Edwards*, 2012 IL 111711, ¶ 32 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).

¶ 20     In the instant case, we find that neither Bingham's testimony nor DeRamus's affidavit justifies granting an evidentiary hearing.

¶ 21     First, we cannot agree that Bingham's testimony that he alone kidnapped and killed the victim constitutes reliable, trustworthy evidence. Bingham made these statements at the evidentiary hearing on codefendant May's successive postconviction petition. In denying May's successive petition, the trial court noted that it had previously heard Bingham testify at the evidentiary hearing on May's section 2-1401 petition and defendant's first successive petition, and found that Bingham's testimony was not credible, honest, or compelling. The trial court found, *inter alia*, that Bingham had said different things at different times and was still not believable. See *People v. May*, No. 1-08-1962, order at 11 (2010) (unpublished order under Supreme Court Rule 23). When presented with the instant petition, the trial court recalled that it had already heard Bingham's recantation of his trial testimony and had "gone through this with him at length, *ad nauseam*." The court stated, "I found the man to be a complete liar. Totally incredible and not worthy of belief." Thus, the testimony upon which defendant is currently relying has already been found unreliable and untrustworthy following a full evidentiary hearing. In these circumstances, we cannot imagine a scenario where the trial court would grant defendant postconviction relief based on hearing Bingham testify yet again at another evidentiary hearing.

¶ 22     We are mindful of defendant's argument that the trial court was required to accept Bingham's testimony as true and that, therefore, the court made an improper credibility

determination when it rejected the testimony. In support of this argument, defendant cites the following language in *People v. Knight*, 405 Ill. App. 3d 461, 470 (2010):

> "The standard, at the second-stage of postconviction proceedings, is that all well-pled allegations are taken as true unless positively rebutted by the record of the proceedings. [Citation.] The standard refers only to the record in the proceedings from which the defendant is seeking postconviction relief and not any other, related proceedings."

*Knight* cites no authority for the proposition that a trial court may not look to related proceedings when determining whether allegations are rebutted by the record, and our research has revealed no other cases so holding. In the circumstances of this case, where the evidence defendant is relying upon is testimony given at an evidentiary hearing in a related proceeding, we decline to follow the rule announced in *Knight*. The trial court heard Bingham's full testimony at a postconviction evidentiary hearing and found it unreliable and untrustworthy. We agree with the State that defendant should be estopped from relying upon the testimony given at that hearing while simultaneously claiming that the trial court may not also consider the conclusion it reached at that proceeding regarding the reliability of the evidence. We will not remand for what would be a futile and meaningless third-stage evidentiary hearing.

¶ 23    With regard to DeRamus's affidavit, we find that it is not of such conclusive nature that it would probably change the result on retrial. See *Ortiz*, 235 Ill. 2d at 333. Newly discovered evidence is considered to be of a conclusive nature if it raises the probability that, in light of the new evidence, it is more likely than not that no reasonable juror would have convicted the defendant. *Edwards*, 2012 IL 111711, ¶ 40. In her affidavit, DeRamus averred that Bingham, "a/k/a 'Porkchop,' " engaged in a narcotics transaction with the victim at Donald Barfield's house, left, but later returned, whereupon he brandished a gun and marched the victim out of the house. According to DeRamus, "At all times that I saw, Bingham acted alone." In contrast to DeRamus's version of events, there was substantial credible evidence adduced at trial that Bingham did not act alone. Donald Barfield testified that defendant, whom he knew as Big Red, came to his house with men he knew as Pork Chop and Little Red, and that once there, all three men engaged in narcotics transactions and together forced the victim from the house. William Ramseur similarly testified that men called Pork Chop, Big Red, and Little Red conducted some "business" with Barfield, left the house, but then returned with guns. According to Ramseur, the three men together took the victim out the back door of the house. Given this evidence, we cannot find that DeRamus's proposed testimony would probably change the result on retrial. That is, DeRamus's affidavit does not raise the probability that, if she testified, it is more likely than not that no reasonable juror would have convicted defendant. See *Edwards*, 2012 IL 111711, ¶ 40.

¶ 24    For the reasons explained above, we conclude that defendant failed to make a substantial showing of actual innocence. Accordingly, we affirm the order of the circuit court of Cook County granting the State's motion to dismiss defendant's second successive postconviction petition.

¶ 25    Affirmed.