# Illinois Official Reports

## Supreme Court

---

### *People v. Sanders*, 2016 IL 118123

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. McCLAIN SANDERS, Appellant. |
| Docket No. | 118123 |
| Filed | January 22, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Circuit court judgment affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg and Patricia Mysza, Deputy Defenders, and Stephen L. Gentry, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People. |

CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Cook County, petitioner McClain Sanders was convicted of first degree murder and aggravated kidnapping. He was sentenced to concurrent prison terms of 60 years and 15 years, respectively. In 2010, petitioner filed a second successive postconviction petition, alleging actual innocence. Despite the absence of any motion by petitioner for leave to file the successive petition, the circuit court allowed it to be filed and advanced it to the second stage of proceedings. The court then dismissed the petition on motion of the State. The appellate court affirmed. 2014 IL App (1st) 111783. We granted petitioner's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 2                                BACKGROUND

¶ 3    Petitioner was charged with the April 1992 murder and aggravated kidnapping of Jonas Cooks. Also charged were Gary Bingham, Aaron May, and Donald Barfield. Separate trials were held, resulting in guilty verdicts. The witnesses described the three men by their nicknames. Bingham was referred to as Pork Chop, May as Little Red, and petitioner as Big Red.

¶ 4    At petitioner's trial, the pathologist who performed an autopsy on Cooks testified that Cooks was shot twice in the head and that the cause of death was multiple gunshot wounds.

¶ 5    Donald Barfield testified at the trial that petitioner was at his house on April 14 with Bingham and May in connection with buying cocaine from Cooks. Several people were present for Barfield's birthday party. Later in the evening, petitioner, Bingham, and May returned to Barfield's house and confronted Cooks about the cocaine. Bingham and May each had a gun. Barfield did not see petitioner with a gun, although there was a gun lying on a table. Bingham asked Barfield to tie Cooks up. Barfield and his friend, Dee Dee, did so with rope, electrical cords, and duct tape. Barfield then untied Cooks so he could make a phone call, but Bingham grabbed the phone out of Cooks' hand, fearing that Cooks might call for help. Cooks was not tied up again. Barfield opened the back door and told the men to leave. As he stood holding the back door open, Barfield could hear scuffling. On direct examination, Barfield said that he saw petitioner, May, and Bingham holding Cooks by the arms, trying to get him out of the house, while Cooks resisted their efforts. On cross-examination, Barfield stated that petitioner did not have his hands on Cooks, that he was trying to get everyone into the kitchen. Barfield made an in-court identification of petitioner during his testimony.

¶ 6    William Ramseur, who was present at Barfield's house on the evening of April 14 for Barfield's birthday party, testified that three men he did not know arrived at the house after midnight and spoke with Barfield and Cooks. The men were saying they wanted their money back. Ramseur testified that each of the three men had a gun and they also had a measuring

scale. Barfield and Dee Dee tied Cooks to a chair. After Barfield learned that Cooks had not given Barfield his share of the cocaine money, he untied Cooks and the three men took Cooks out of the house.

¶ 7    Cheryl Lathan, Cooks' girlfriend, testified at petitioner's trial that she went on two cocaine buys with Cooks on the evening of April 14. On the first one, Barfield and two females she did not know accompanied them. They went back to Barfield's house, where Cooks talked to Bingham and May. Lathan went with Cooks and Bingham to buy more cocaine. Cooks purchased cocaine from some Latino men and gave it to Bingham. They then drove to Homan Avenue where Cooks and Bingham got out of the car and stood in front of a reddish-brown brick building. Cooks asked her to drive back to Barfield's house and tell May to come to Homan Avenue. She did so; when she got to Barfield's house, she did not go inside, as May was sitting in his car with some women she did not know. When she returned to Homan Avenue, she and Cooks left, leaving Bingham and May there. Lathan stated that she identified Bingham and May in a lineup.

¶ 8    Bingham testified that he, petitioner, and May were in partnership selling cocaine. On the day of the murder, he purchased cocaine from Jonas Cooks. While cooking the cocaine, May discovered that the amount of the cocaine was six grams short. May contacted Bingham and called petitioner, who went upstairs in his mother's house on Homan Avenue and retrieved three guns. They took the guns, the cocaine, and a measuring scale to Barfield's house, where they confronted Cooks. Cooks asked to be given a chance to get Bingham's money back. Barfield tied Cooks to a chair. After further discussion, petitioner told May to drive his car to the rear of the house. Petitioner and Bingham, who were both in possession of guns, then dragged Cooks, who was no longer tied up, out the back door and put him in the trunk of the car. At petitioner's direction, May drove the car to an abandoned building. Petitioner removed Cooks from the car trunk and took him into the building, while Bingham and May waited outside. Bingham testified that petitioner shot Cooks twice. Bingham, who had already been convicted of Cooks' murder, denied receiving any benefit from the State in exchange for his testimony against petitioner.

¶ 9    Gene Harris, a Chicago police detective, testified that Cheryl Lathan showed him the reddish-brown brick building at 1645 South Homan Avenue and also the house where Barfield lived. William Ramseur viewed a lineup after petitioner had been arrested. Detective Harris testified that Ramseur identified petitioner. Ramseur had previously identified Aaron May in a different lineup. Barfield identified Bingham and May in a lineup that did not contain petitioner, who was arrested sometime later. Detective Harris went to the home of petitioner's mother at 1639 South Homan Avenue where Bingham told him petitioner lived. Petitioner was not there at the time, and his mother told Detective Harris that she did not know where he was. When petitioner was later taken into custody, he told Detective Harris that he lived at his mother's house.

¶ 10    Petitioner presented an alibi defense. Felicia Hollivay, petitioner's girlfriend, testified that at the time of the shooting of Cooks, she, petitioner, their child, Hollivay's friend and the friend's daughter were all living at 1412 Parnell Avenue in Chicago Heights. They had lived there since August 1991. Hollivay testified that on the morning of April 14, 1992, she took her daughter to preschool. Petitioner was in bed, and he was there when she returned. He did not

leave the house until about 3 p.m. that afternoon to go to the Oak Park health club. Petitioner arrived home around midnight. They ate, watched television and went to bed around 3 a.m.

¶ 11    Charles Tobias testified that he worked as a personal trainer at the Chicago Health Club in Oak Park in April 1992. He had known petitioner since college. On April 14, he lifted weights with petitioner. They left the health club together when his shift ended at 9 p.m. After they stopped for a few drinks, petitioner dropped Tobias off at his house around 9:45 p.m.

¶ 12    Petitioner testified in his own defense. He stated that he had been twice convicted of drug-related felonies and once for unlawful use of a weapon. He denied having any business relationship with Bingham. In April 1992, he was living in Chicago Heights. He denied that he sold cocaine. He was unemployed at the time, and he and Hollivay shared the rent with her friend. Petitioner denied being at Barfield's house at any time on April 14 or April 15. He also denied shooting Jonas Cooks. He was at home between midnight on April 14 and 8 a.m. on April 15. Petitioner denied having any guns or giving any guns to anyone else. On cross-examination, petitioner stated that he had never been known as Big Red and that he did not know who Little Red was. Petitioner also claimed that he merely knew of Bingham but did not know him personally. Petitioner identified a photo of May and acknowledged that May was his nephew.

¶ 13    Following the appellate court's affirmance of his convictions for murder and aggravated kidnapping, petitioner filed an initial postconviction petition in 1997. That petition was summarily dismissed, and the appellate court affirmed. Petitioner filed a first successive postconviction petition in 1999, alleging that the State had knowingly introduced perjured testimony at his trial when Bingham testified that he had received no promises of leniency from the State in exchange for his testimony. Petitioner alleged that Bingham had agreed to testify against him in exchange for help from Chicago police detective Hugh Conwell on a case involving the shooting of Bingham's brother. Petitioner also alleged that the State had promised Bingham a reduced sentence. Aaron May had filed a section 2-1401 petition at about the same time, making similar allegations. The trial court held a joint evidentiary hearing on both petitions. Both Conwell and Bingham testified. The trial court denied relief, finding Conwell to be credible and Bingham to be "very incredible." The court found that though Bingham received the minimum sentence in his own murder case, that sentence was not the result of any deal with the State. The trial court concluded that the reason Bingham testified against petitioner was that he realized that, as the only person to have confessed, he might be the only one of the perpetrators to be convicted of the murder and go to prison.

¶ 14    In 2010, petitioner filed the instant second successive postconviction petition, alleging newly discovered evidence of actual innocence, that Bingham's trial testimony was perjured, and that petitioner's sentence was excessive given the perjured testimony. The petition was supported by affidavits from Jovanna Liberty, Aaron Johnson, and Patricia DeRamus. The petition also attached a transcript containing excerpts of testimony that Bingham had given at a 2007 evidentiary hearing on a postconviction petition filed by Aaron May. The affidavit from Johnson stated that while he and Bingham were incarcerated together at the Cook County jail, he heard Bingham admit to killing Cooks in retaliation for cheating him on a drug sale. Liberty's affidavit stated that in April 1992, she heard Bingham say that he had killed someone for stealing drugs that Bingham had given him to sell and he mentioned forcing the person into the trunk of his car, taking him to an abandoned building, and shooting him twice in the head.

¶ 15    Patricia DeRamus stated in her affidavit that she was known as "DD." She, Cooks, and Barfield were present at Barfield's house on April 14, 1992. She stated that Bingham entered the house and told Barfield that he wanted to purchase $1000 of powder cocaine. Cooks told Bingham that he could get the cocaine and he and Bingham left the house together. Cooks later returned alone. About 45 minutes later, Bingham returned to the house with a gun and the cocaine. He confronted Cooks, claiming that the cocaine was "garbage," and he struck Cooks in the head with the gun. Subsequently, DeRamus saw Bingham "march" Cooks out the back door at gunpoint. She never saw Cooks again. At all times that she observed, Bingham acted alone. DeRamus further stated that Bingham later returned to Barfield's house that evening, stating that he had killed Cooks. Bingham also threatened to kill anyone who revealed what had taken place. DeRamus further stated in her affidavit that at the time of the events in question, she was pregnant with her tenth child. She was afraid to come forward with what she had witnessed because Bingham was from her community and knew how to find her. Since then, she had undergone therapy and mentoring, and realized that she had to come forward to clear her conscience and make amends for her years of silence.

¶ 16    During his 2007 testimony at May's evidentiary hearing, Bingham recanted his testimony identifying May and petitioner as participating in Cooks' murder. Bingham testified that after he purchased the cocaine from Cooks and Barfield, he went to a friend's house to cook the cocaine. May was not with him at any time. There were several people at Barfield's house, including DeRamus and Ramseur. The cocaine Bingham purchased was no good. Bingham took the cocaine and a measuring scale to Barfield's house and told Barfield and Cooks that he wanted his money back. Barfield and Cooks made phone calls to try to get the money back, to no avail. After Barfield tied and duct taped Cooks, Bingham picked up Cooks by himself, threw him over his shoulder and carried him outside. Bingham then put Cooks in the trunk of Bingham's car. Bingham drove to an abandoned building. He was alone when he did this. Bingham testified that his prior testimony at May's trial implicating May was not true. He testified that he lied about May because he was mad and frustrated. He thought that May would visit him in jail, but he did not. Bingham stated that he just did what the State asked him to do. He claimed the State indicated that if he placed May at the scene of the crime, he would receive a sentence of 20 years. Bingham recalled testifying at the joint evidentiary hearing in 2000. When asked why he did not take sole responsibility for Cooks' murder at that time, Bingham testified that the State kept coming at him, saying that May and petitioner were out on bond; take them down with you. Bingham testified that he tried to tell the truth in the beginning but the State wanted them for some reason. Bingham denied being in the drug business with May or petitioner. Bingham testified that he shot Cooks one time.

¶ 17    We note that the same trial judge who presided over petitioner's successive proceedings in this case also presided at Aaron May's 2007 postconviction evidentiary hearing. In November 2010, private counsel appeared before the trial court on petitioner's behalf and informed the court that this was a first-stage proceeding. The trial judge noted that "I already had a couple evidentiary hearings when I had the co-Defendants about all this." Petitioner's counsel confirmed the court's recollection on that, but never advised the court that the petition he was presenting to the court was a second successive postconviction petition. The court noted that "All I have to do is read it and decide if it goes to the second stage or not." The trial court set the matter over for December 3, 2010.

¶ 18     On that date, petitioner's counsel and an assistant State's Attorney appeared. The trial court noted that it had "been through this story before, but I suppose there is at least a gist of the claim—stage two." The court docketed the petition. At no time did petitioner's counsel file a motion for leave to file the successive petition.

¶ 19     The State filed a motion to dismiss the petition, alleging that the purported evidence of actual innocence was not newly discovered, that the affidavits and Bingham's recantation would not likely change the result of the trial, and that the trial court had already found Bingham lacking in credibility based on his testimony at two prior evidentiary hearings. At the hearing on the motion to dismiss, the trial court noted that it had heard Bingham testify twice before in postconviction proceedings and that it had found Bingham "to be a complete liar. Totally incredible and not worthy of belief." The court noted that the affidavits petitioner presented all depended on statements Bingham made to the affiants. The court stated that it would incorporate by reference Bingham's testimony from the prior evidentiary hearings. The court allowed the State's motion to dismiss. Petitioner appealed.

¶ 20     The appellate court rejected petitioner's argument that the trial court made an improper credibility determination when it relied on its finding at May's 2007 postconviction hearing that Bingham was not a credible witness. The appellate court found that petitioner should be estopped from relying on Bingham's recantation in the related proceeding, while simultaneously claiming that the trial court could not also consider the conclusion it reached in the related proceeding regarding the credibility of the recantation. The appellate court also found that DeRamus's affidavit was not of such conclusive character as to probably change the result on retrial. The court noted that there was substantial credible evidence at petitioner's trial that Bingham did not act alone. 2014 IL App (1st) 111783, ¶¶ 22, 23.

¶ 21                                    ANALYSIS

¶ 22     The overriding question before us in this case is whether petitioner successfully set forth a claim of actual innocence in his 2010 successive postconviction petition.

¶ 23                        I. Leave to File Successive Petition

¶ 24     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) contemplates the filing of only one petition without leave of court (725 ILCS 5/122-1(f) (West 2014)), and any claim not presented in an original or amended petition is waived. 725 ILCS 5/122-3 (West 2014). This court has identified two bases upon which the bar against successive petitions will be relaxed. The first is when the petitioner satisfies the cause and prejudice test. 725 ILCS 5/122-1(f) (West 2014); *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). The second exception is known as the fundamental miscarriage of justice exception. That exception requires the petitioner to demonstrate actual innocence. The evidence of actual innocence must be (1) newly discovered, (2) not discoverable earlier through the exercise of due diligence, (3) material and not merely cumulative, and (4) of such conclusive character that it would probably change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32; *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). This court held in *Edwards* that leave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence. In other words, leave of court should be granted

where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. *Edwards*, 2012 IL 111711, ¶ 24.

¶ 25 In the instant case, petitioner's counsel did not file a motion seeking leave to file petitioner's second successive postconviction petition. Nor did counsel orally advise the trial court that this was a successive petition and make a request for leave to file. Nonetheless, this court has held that the trial court may rule on a successive postconviction petition where leave to file has not been sought when documents submitted by a petitioner supply an adequate basis to determine whether the petitioner has sufficiently alleged cause and prejudice (*People v. Tidwell*, 236 Ill. 2d 150, 152 (2010)) or actual innocence (*Edwards*, 2012 IL 111711, ¶ 24).

¶ 26 Here, it is unclear whether the trial court was aware that the petition before it was a successive petition. The court recalled past evidentiary hearings concerning Bingham, but noted they took place in petitioner's codefendants' cases. Subsequently, the court found that the petition presented the gist of a claim and docketed it for second-stage proceedings. The State suggests that the trial court may have applied the "gist" standard to the successive petition because it was not until the instant case was pending on appeal that this court clarified the precise showing necessary to qualify for successive postconviction proceedings. See *id.*; *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 27 Whatever the trial court believed, however, it did in fact set the petition over to the second stage, and we have held that even when no request for leave to file a successive petition is made, the trial court may nonetheless rule on the petition, but is not obliged to do so. *Tidwell*, 236 Ill. 2d at 152. In *Tidwell*, the postconviction petitioner filed a successive petition, but did not file a motion or make a request for leave to file. Regardless, the trial court considered the allegations of the petition as they related to the threshold issue of cause and prejudice and issued a written order detailing its reasons for concluding that the petitioner had failed to satisfy the cause and prejudice test. The questions before this court were whether a motion or request is required to obtain a ruling allowing or denying leave to file a successive postconviction petition, and whether a ruling rendered in the absence of a motion or request is subject to review in the appellate court. This court noted that section 122-1(f) of the Act does not impose a motion requirement, but merely says that a petitioner must first obtain leave of court and that leave may only be granted where the petitioner demonstrates cause and prejudice. By whatever means, this court observed, it is incumbent upon the postconviction petitioner to prompt the trial court to consider whether leave should be granted and to obtain a ruling on whether the petitioner has demonstrated cause and prejudice. *Id.* at 156-57. However, even in the absence of an articulated request, this court noted that the trial court could *sua sponte* grant leave to file the successive petition, but was not required to do so. This court also held that there is no impediment to appellate review of the trial court's ruling in such a case. *Id.* at 158, 162.

¶ 28 Thus, we hold that, although no request for leave to file was made in the instant case, the trial court had the authority to *sua sponte* consider whether the successive petition should be docketed for second-stage proceedings.

¶ 29                                    II. Second-Stage Proceedings

¶ 30       Petitioner argues that his successive postconviction petition made a substantial showing of actual innocence, relying upon Gary Bingham's testimony at May's 2007 postconviction hearing and the affidavit of Patricia DeRamus.[1]

¶ 31       The trial court here granted the State's motion to dismiss the successive petition at the second stage. The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*. The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the Act. Since there are no factual issues at the dismissal stage of the proceedings, the question is essentially a legal one, which requires the reviewing court to make its own independent assessment of the allegations of the petition and supporting documentation. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

¶ 32       The State argues that the lower courts' findings were fully compliant with this court's decision in *Edwards*. The State notes that *Edwards*, citing the United States Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298, 324 (1995), stated that actual innocence claims must be supported with new reliable evidence, such as, *inter alia*, "trustworthy" eyewitness accounts. *Edwards*, 2012 IL 111711, ¶ 32. Accordingly, the State argues, a threshold finding of trustworthiness must be made before a court may determine whether a postconviction petitioner has set forth a colorable claim of actual innocence. Given this requirement, the State further asserts, a court may not mechanically assume that statements in an affidavit or a recantation of trial testimony are true. To do so would relieve a petitioner of his or her duty to demonstrate a colorable claim of actual innocence, since only reliable evidence will support such a claim. According to the State, Bingham's recantation testimony was not reliable because the trial court had previously found the testimony to be lacking in credibility. In addition, the State argues, DeRamus's affidavit is similarly unreliable because it relies on Bingham's unreliable recantation testimony.

¶ 33       It is true that recantation testimony is regarded as inherently unreliable and that a court will not grant a new trial on that basis absent extraordinary circumstances. *Morgan*, 212 Ill. 2d at 155. However, that determination is not made at the motion to dismiss stage of postconviction proceedings where well-pleaded facts must be taken as true. The State made a similar argument in *Coleman*, which this court rejected.

¶ 34       In *Coleman*, the postconviction petitioner had been sentenced to death. He filed an amended postconviction petition alleging that the State had procured perjured testimony and failed to disclose exculpatory evidence to the defense. He attached an affidavit from Aldene Lockett, who testified at trial that she lived in the building where the shooting took place. In her trial testimony, Lockett said she saw the perpetrator and described him as a dark-complected young man. She viewed a lineup in which the petitioner was one of the participants. When she told police the man she saw was wearing sunglasses, an officer told the men in the lineup to put on sunglasses. All complied except the petitioner. Lockett testified that the man who did not put on the sunglasses was the same height and weight of the man she saw

---

[1]Petitioner has apparently abandoned any reliance on the affidavits of Aaron Johnson and Jovanna Liberty.

leaving the building. She did not positively identify anyone from the lineup; she merely told police the man without sunglasses could have been the same man she saw leave the murder scene because he had the same height, build, and color. *Coleman*, 183 Ill. 2d at 371.

¶ 35    In her affidavit attached to the petitioner's postconviction petition, Lockett stated that she recognized the gunman as someone from the neighborhood. While viewing the lineup, she felt that the police were trying to encourage her to identify the man who refused to put on sunglasses because they "went back to him" and told her that this was the man they had picked up for the murders. Lockett stated in her affidavit that she told police the man in the lineup without sunglasses was not dark enough to be the man she saw. She also stated that she did not recall seeing the man without sunglasses in the neighborhood. Lockett stated that the assistant State's Attorney and his investigators called her repeatedly to go over her testimony to make sure it did not change. In exchange for her testimony, the investigators promised to move her to Alabama or to another place in Chicago, but they failed to do so. *Id.* at 377.

¶ 36    The State filed a motion to dismiss the petition in *Coleman*, which the trial court granted. On appeal to this court, the State argued that the real issue was whether Lockett's recantation was reliable, noting that recantations have historically been regarded as unreliable. This court concluded that the State's reliability argument was premature, given the case's procedural posture. The petitioner's allegations, supported by Lockett's affidavit, had not been refuted or denied. The court noted that the original trial record did not controvert the charges that perjured evidence was used and that favorable evidence was knowingly suppressed by the State. There had been no determination of the veracity of the allegations. By seeking to dismiss the petition, the State assumed the truth of the factual allegations of the petition, at least for purposes of its motion to dismiss. Thus, the court noted, the State had eliminated all factual issues from the inquiry. Accordingly, this court concluded that the State could not on appeal seek affirmance of the dismissal order by arguing that Lockett's recantation was lacking in credibility or was untrustworthy. Had the State wished to test Lockett's credibility, it should have answered the postconviction petition rather than seeking to have it dismissed. *Id.* at 390.

¶ 37    Although *Coleman* involved an initial petition, the standards at the second stage of postconviction proceedings are the same for successive petitions. A petitioner must make a substantial showing of actual innocence such that an evidentiary hearing is warranted. *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 34. All well-pleaded factual allegations must be taken as true for purposes of the State's motion to dismiss. *People v. Harris*, 206 Ill. 2d 293, 299 (2002). The State's reliance on *Edwards*' mention of "reliability" is contrary to this standard. We emphasize that this court merely cited the *Schlup* case. We did not hold that the trial court could effectively assess the credibility of witnesses and affiants by judging the reliability of their statements.

¶ 38    The parties also dispute whether the trial court could rely on its credibility finding regarding Bingham's testimony at May's 2007 postconviction evidentiary hearing.

¶ 39    Petitioner cites two appellate court cases in support of his argument that the trial court was required to accept Bingham's testimony as true and that it made an impermissible credibility determination when it looked to Aaron May's postconviction hearing to reject the testimony. In *People v. Knight*, 405 Ill. App. 3d 461 (2010), the postconviction petitioner had pleaded guilty to murder for the stabbing death of a fellow inmate. Other inmates were charged in separate proceedings. Affidavits were attached to the petition in support of its allegations. One

of the affidavits was that of Eddie Collier, who had pleaded guilty to a lesser charge in connection with the inmate's murder. Collier stated in his guilty plea proceeding that the petitioner had stabbed the inmate while Collier participated. The petitioner's initial postconviction petition was dismissed on the State's motion as untimely. He filed a second petition that claimed actual innocence. The trial court dismissed that petition as untimely. The appellate court reversed for second-stage proceedings. On remand, the trial court granted the State's motion to dismiss. Because the postconviction proceedings had been pending for several years, the appellate court declined to remand the cause to the trial court again and instead reversed its judgment outright. The appellate court found that the petitioner had satisfied his burden to reach the third stage of postconviction proceedings and that he was entitled to an evidentiary hearing on his claim of actual innocence. *Id.* at 465.

¶ 40        The State argued that the petitioner was not entitled to an evidentiary hearing because Collier's affidavit was rebutted by the record of proceedings in Collier's own prosecution. The appellate court rejected this argument, noting that the State cited no authority for its reliance on the report of proceedings in Collier's prosecution. The court held that the State may not raise any argument that the proceedings of Collier's guilty plea positively rebutted the petitioner's well-pleaded allegations. The court noted that the standard at the second stage of postconviction proceedings is that all well-pleaded allegations of the petition and accompanying affidavits are taken as true unless positively rebutted by the record of the proceedings. The court further declared that the standard refers only to the record of the proceedings from which the petitioner seeks postconviction relief and not any other related proceedings. Since there was nothing in the record of petitioner's proceedings to positively rebut Collier's affidavit or the allegations of the petition, the appellate court found that the petitioner was entitled to an evidentiary hearing. *Id.* at 470. The appellate court further noted that the petitioner's claim of actual innocence depended primarily on the credibility of the witnesses in support of his claim. Credibility of witnesses is a matter that can only be resolved by an evidentiary hearing. *Id.* at 471.

¶ 41        Petitioner cites a second appellate court case in the same vein, *People v. Harper*, 2013 IL App (1st) 102181. There, the postconviction petitioner was convicted of murder and arson. He filed a successive petition claiming actual innocence. He attached to his petition the affidavit of James Bell, who admitted setting the fire. The petitioner also attached a copy of the transcript of Bell's testimony at the postconviction proceeding of the petitioner's codefendant. The transcript revealed that Bell testified that he was responsible for setting the fire. The State filed a motion to dismiss the petition. The trial court granted the motion. On appeal, the State argued that Bell's testimony and affidavit were unreliable because they were positively rebutted by the trial evidence. In addition, the State relied on the appellate court's Rule 23 order in the codefendant's case in which the appellate court rejected Bell's testimony in the codefendant's appeal. The appellate court rejected the State's implication that the rejection of Bell's testimony in the related proceeding should dictate a similar result in the petitioner's case. The court noted that this was clearly improper and that the findings of the appellate court in the codefendant's appeal could not be substituted for a third-stage evidentiary hearing in the petitioner's case. The court noted that at the second stage of postconviction proceedings, it must take all well-pleaded facts as true. *Id.* ¶ 44.

¶ 42        We hold that the trial court here erred in considering the credibility determination it made after hearing Bingham's recantation testimony at May's 2007 postconviction evidentiary

hearing. We have already noted that credibility is not an issue at the second stage of postconviction proceedings. All well-pleaded factual allegations not positively rebutted by the trial record must be taken as true for purposes of the State's motion to dismiss. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Childress*, 191 Ill. 2d 168, 174 (2000). Thus, the trial court erred in considering its credibility finding at May's postconviction hearing. Credibility determinations may be made only at a third-stage evidentiary hearing. See *Coleman*, 183 Ill. 2d at 390. Like the appellate court in *Harper*, we find that the trial court's rejection of Bingham's testimony in the related proceeding cannot be substituted for a third-stage evidentiary hearing in petitioner's case. *Harper*, 2013 IL App (1st) 102181, ¶ 44.

¶ 43    We also hold that the trial court erred in considering matters outside the record of petitioner's case. While the appellate court here criticized the *Knight* court for failing to cite authority in support of its holding that related proceedings may not be considered, we note the appellate court cited no authority in support of its own determination that the trial court could consider the record in May's postconviction evidentiary hearing. The Act itself contemplates that the trial court will look only to the record of the subject petitioner's case. Section 122-2.1(c) of the Act (725 ILCS 5/122-2.1(c) (West 2014)) states:

> "(c) In considering a petition pursuant to this Section, the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding."

¶ 44    While section 122-2.1 of the Act governs trial court actions on an initial petition, there is no indication in the Act that the trial court has authority to look beyond the record at later stages in the proceedings. We therefore reject the argument that the trial court may consider the record of proceedings not involving the petitioner whose case is before the court.

¶ 45    The State argues that petitioner is estopped from relying on selected excerpts of Bingham's recantation testimony from May's hearing rather than the totality of the testimony. The Act specifically authorizes the trial court to receive proof by affidavits, depositions, or oral testimony. See 725 ILCS 5/122-6 (West 2014). In addition, a postconviction petitioner is required to attach to his petition affidavits, records, or other evidence supporting the petition's allegations or state why the same are not attached. 725 ILCS 5/122-2 (West 2014). Petitioner's actual innocence claim relies in part on Bingham's recantation; therefore, he was required to attach an affidavit from Bingham or other evidence of the recantation. While petitioner attached only the excerpts from Bingham's testimony that he apparently believed supported his claim, the State is always free to provide the trial court with the complete transcript. The State also argues that petitioner was estopped from relying on Bingham's recantation testimony while claiming that the trial court could not consider the conclusion it reached regarding Bingham's lack of credibility. We reject this argument for the reasons explained above; credibility findings may not be relied upon at the second stage of postconviction proceedings.

¶ 46    As we have noted above, to advance to the third stage of postconviction proceedings based upon a claim of actual innocence, a petitioner must show that the evidence is newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

¶ 47    The State argues that Bingham's recantation and DeRamus's affidavit are not newly discovered. It does not argue that the new evidence was not material or was merely cumulative.

- 11 -

We need not address whether petitioner's new evidence could have been discovered earlier in the exercise of due diligence and whether it is material and not merely cumulative because we conclude that, even assuming these conditions have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial. We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. See *Edwards*, 2012 IL 111711, ¶ 40. We note that the conclusiveness of the new evidence is the most important element of an actual innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 48        Well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings. *Coleman*, 183 Ill. 2d at 382. Here, Bingham testified at petitioner's trial, implicating petitioner in the kidnapping and murder of Cooks. Now, he has recanted that testimony and claims that petitioner was not involved. This recantation conflicts with much of the evidence at petitioner's trial. For instance, the pathologist who performed the autopsy on Cooks testified that Cooks was shot twice in the back of the head, and that the cause of death was multiple gunshot wounds. Bingham testified in his recantation that he shot Cooks only once. Thus, this part of Bingham's recantation is positively rebutted by the trial record. Witnesses at trial testified to petitioner's presence at Barfield's house and his involvement in kidnapping Cooks. William Ramseur testified that three men he did not know arrived at Barfield's house after midnight and spoke with Barfield and Cooks. The men were saying they wanted their money back. Each of the three men had a gun. Barfield and Dee Dee tied Cooks to a chair. After Barfield learned that Cooks had not given Barfield his share of the money received for the cocaine, he untied Cooks and the three men took Cooks out of Barfield's house.

¶ 49        Donald Barfield's testimony also placed petitioner at his house during the incident with Cooks, both to buy the cocaine and later to confront Cooks with a demand for a refund. Cooks was tied up by Barfield and Dee Dee. Bingham, petitioner, and May were involved in getting Cooks out of the house. Barfield identified petitioner at the trial.

¶ 50        Cheryl Lathan, although she did not see petitioner, testified that she and Cooks dropped Bingham off on Homan Avenue and that she went back to Barfield's house, saw May sitting in his car, and told him that Bingham wanted him to go to Homan Avenue. Bingham testified that after May told him the cocaine was short, petitioner went inside his mother's house on Homan Avenue and retrieved three guns. They then went to Barfield's house.

¶ 51        Chicago police detective Gene Harris testified that Ramseur identified petitioner in a lineup. Detective Harris also testified that petitioner told him when he was taken into custody that he lived at his mother's house on Homan Avenue.

¶ 52        Petitioner presented two alibi witnesses and testified in his own defense. Charles Tobias's testimony did not provide an alibi for the time during which the other witnesses testified that Bingham, petitioner, and May were at Barfield's house and left with Cooks. Tobias was with petitioner only until about 9:45 p.m. on April 14, the night of the murder. The kidnapping of Cooks and his subsequent murder took place around or after midnight on April 14. This leaves the testimony of petitioner denying all involvement and that of his girlfriend, Felicia Hollivay, who provided an alibi for petitioner starting at midnight on the night of the murder. Thus, Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to

the testimony of Ramseur and Barfield, who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having participated in the events leading up to Cooks' murder. It is also contradicted by the pathologist's testimony that Cooks was shot twice in the head, not once, as Bingham claimed in his recantation. Bingham's recantation testimony merely adds conflicting evidence to the evidence adduced at the trial. Even taking the well-pleaded facts as true, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial.

¶ 53 The same must be said of the factual statements in DeRamus's affidavit. Her statements merely contradict the testimony of other occurrence witnesses. Further, we note that DeRamus's statement that Bingham "marched" Cooks out the back door of Barfield's house directly contradicts Bingham's recantation testimony when he said that he picked up Cooks, threw him over his shoulder, and took him out the back door. Like Bingham's recantation, DeRamus's proposed testimony would merely add to the evidence the jury heard at petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with Bingham's recantation.

¶ 54                                                  CONCLUSION

¶ 55 We note that we may affirm the appellate court's judgment on any basis supported by the record. *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005). Although the appellate court erred in relying on the trial judge's credibility finding at May's 2007 postconviction hearing, the result is the same. We hold that petitioner failed to carry his burden to make a substantial showing of a claim of actual innocence. Thus, his successive postconviction petition was properly dismissed at the second stage. We therefore affirm the judgments below.

¶ 56 Appellate court judgment affirmed.

¶ 57 Circuit court judgment affirmed.