2020 IL App (1st) 172568-U

No. 1-17-2568

Order originally filed June 12, 2020

Modified upon Denial of Rehearing August, 21 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 11999 |
| | ) | |
| GILBERTO VARGAS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*: Where the affidavits supporting defendant's postconviction claim of actual innocence are not of such conclusive character that they would probably change the result if a new trial were granted, the circuit court did not err in granting the State's motion to dismiss.

¶ 2     Defendant Gilberto Vargas, who was convicted of first degree murder, appeals from the second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act)

(725 ILCS 5/122-1 *et seq.* (West 2014)). On appeal, defendant contends that his petition made a substantial showing of actual innocence where he presented newly discovered evidence that it was not him, but rather, the driver of the vehicle in which he was traveling, who shot and killed the victim. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from the shooting death of Jose Galaviz on June 20, 2009, in Chicago. Following his arrest, defendant was charged by indictment with multiple counts of first degree murder, attempt first degree murder, and aggravated discharge of a firearm. The State proceeded on six counts of first degree murder. At defendant's 2012 jury trial, the defense theory of the case was misidentification. Due to the nature of defendant's claim in this appeal, we will set forth the pertinent facts adduced at trial.

¶ 4    Yesenia Galaviz testified that on the day in question, she and her brother, Jose, gathered with several friends.[1] Early that evening, the group set out in a minivan for the Puerto Rican Day parade in Humboldt Park. Larry Garvin drove, Danny Olave sat in the front passenger seat, Erick Alamo and Jose sat in the middle row, and Jessica Macias and Yesenia sat in the back row. All the minivan's windows were rolled down and both sliding doors were open. Traffic on Western Avenue was bumper to bumper and there were people everywhere, celebrating and waving flags.

¶ 5    Shortly before 7 p.m., as the group was stopped in southbound traffic on Western near the intersection with Hirsch Street, a man approached the passenger side of the minivan. He was about four feet from Yesenia and nothing obstructed her view of his face. He had a short haircut, "[a]most bald, but not quite." In court, Yesenia identified defendant as this man. Defendant asked Jose if he or anyone in the minivan was a gangbanger. Jose said, "[N]o. We don't gangbang. We're

---

[1] Because Yesenia Galaviz and Jose Galaviz have the same last name, we will refer to them by their first names.

partying." Defendant responded that they were "cool" and walked back to the corner, where he joined several other men.

¶ 6    Garvin briefly continued driving southbound on Western, but the group decided to go home because the encounter gave them a "bad feeling" that something would happen. As they were waiting on Western to turn left onto North Avenue, a vehicle occupied by two men pulled beside the driver's side of the minivan so that the vehicle's passenger was in-line with Jose. Yesenia recognized the passenger as defendant from his interaction with Jose 10 minutes earlier. Defendant said, "I thought you all don't gangbang" and shot Jose. When Jose leaned forward, Yesenia grabbed him, looked to her left, and made eye contact with defendant. Defendant told the driver of the vehicle to "keep going" and the vehicle drove off. Yesenia pulled Jose into the back row of seats and hit his face repeatedly in an effort to keep him conscious as Garvin drove to St. Elizabeth Hospital.

¶ 7    While at St. Elizabeth Hospital, Yesenia spoke with the police. She told them what happened and provided a description of defendant. At some point, Jose was transferred to Stroger Hospital, where he died. Yesenia spoke with the police at Stroger Hospital and, later that evening, went to the police station. There, she identified defendant in a photo array. On June 23, 2009, she identified defendant in a lineup.

¶ 8    On cross-examination, Yesenia agreed that she never saw the vehicle's passenger with a firearm, never saw a firearm in his hand, and never saw a firearm extend out of the vehicle's window. When asked, "You saw the passenger lean back and then you heard the shot, right?" she answered affirmatively.

¶ 9    Macias, Olave, Alamo, and Garvin testified to substantially the same events as Yesenia. They agreed that defendant, whom they all identified in court and described as having a short or

"low" hairstyle, approached their minivan on foot and asked about gang affiliation. They denied gang affiliation and drove off, but shortly thereafter turned around, and while they were waiting to turn left onto North Avenue, a vehicle pulled beside them. Defendant, who was in the passenger seat, made a comment about gangbanging.

¶ 10    Macias testified that she saw defendant pull out a firearm, point it at Jose, and fire. Olave testified that defendant shot Jose; he specified that he saw a firearm in defendant's hand and heard a "big pop." Alamo stated that he saw defendant draw a firearm and shoot Jose. Garvin testified that he saw defendant raise and point a handgun at Jose, ducked, accelerated, and heard one gunshot. At the police station, Garvin identified defendant from a "bunch of pictures," and Olave and Alamo also testified that they identified defendant in photo arrays. Macias, Olave, Alamo, and Garvin all testified that they later identified defendant in lineups.

¶ 11    Erick Ortiz testified that on June 20, 2009, he saw defendant, who was his cousin's boyfriend, at the corner of Western and Hirsch. Defendant was with two other men, one whom Ortiz did not know, and the other whom he knew as "G-Man." Ortiz joined defendant, who was "looking around, watching people, and just looking at people into cars and stuff like that." Later in the afternoon, defendant and G-Man left the corner and jogged across the street toward a barber shop. After 20 to 30 minutes, Ortiz called defendant. He then went to a friend's house to meet defendant in the gangway. Defendant, who was with G-Man and some other men, said, "I f*** up." Ortiz asked what he meant, but defendant just kept repeating himself. Following this interaction, Ortiz, defendant, and G-Man waited in the gangway for defendant's girlfriend to pick them up. She never arrived, so a different friend of defendant's drove Ortiz, defendant, and G-Man to another house. About 10 minutes later, defendant's girlfriend drove them to a fast food restaurant.

¶ 12    Dr. Michel Humilier, the forensic pathologist who performed Jose's autopsy, testified that Jose suffered one gunshot wound to the left chest. Humilier recovered one bullet from Jose's body. Humilier determined the cause of death was a gunshot wound of the chest and the manner of death was homicide.

¶ 13    Chicago police detective Leonard Goduto testified that about 7:30 p.m. on June 20, 2009, he and his partner responded to a call of a person shot at Western and North. The detectives went to that location but did not find any information about the shooting. They proceeded to St. Elizabeth Hospital. There, Goduto viewed the minivan and spoke with another detective. Goduto and his partner then returned to the scene of the shooting, where Goduto's partner found one .45-caliber shell casing in the middle of the street. An evidence technician who was called to the scene recovered the shell casing.

¶ 14    Chicago police officer Jon Ohlicher testified that he knew defendant, whom he identified in court, as Gilberto Angel Vargas. He also knew defendant had a twin brother, Gilberto Luis Vargas, and that the brothers shared a nickname, "Twin." On June 22, 2009, Ohlicher was on patrol in the Humboldt Park neighborhood. At the time, he knew defendant had been identified by several witnesses as Jose's shooter. Ohlicher was also looking for Gilberto Luis Vargas, as he had an outstanding warrant on an unrelated case. At approximately 8 p.m., Ohlicher saw one of the brothers standing on a sidewalk. He approached and asked the man his name. When the man answered that he was "Gilberto Vargas," Ohlicher detained him. The man was transported to the police station, where it was determined based on his tattoos that he was defendant.

¶ 15    Chicago police sergeant John Folino testified that on June 22 and 23, 2009, he and a detective who had *Mirandized* defendant had several video- and audio-recorded conversations with defendant while he was in custody. Defendant stated that on the day of the shooting, his son's

mother dropped his son off at his house. He and his son were inside all day because his son had a "double ear infection." Then, around 7 p.m., defendant's mother dropped him and his son off at a barbeque at a friend's house, where they stayed until 10 or 11 p.m.

¶ 16    Patricia Sasso, the mother of defendant's son, testified that on the day of the shooting, she went to the Puerto Rican Day festival and left their son at home with her other child's grandmother. Sasso stated that she did not drop their son off at defendant's house and that defendant had no contact with him that day. She also denied that their son had a double ear infection.

¶ 17    Chicago police detective Demosthenes Balodimas testified that he responded to St. Elizabeth Hospital. There, he spoke with Yesenia, Garvin, Macias, Olave, and Alamo and received a description of the shooter. Early the next morning, the witnesses went to the police station. Garvin identified defendant as the shooter from a "pile" of 29 photos. Then, Yesenia, Olave, and Alamo identified defendant in separate six-person photo arrays. Macias tentatively identified defendant in a six-person array but stated she would feel more comfortable viewing a physical lineup. On June 23, 2009, Yesenia, Garvin, Macias, Olave, and Alamo returned to the police station and each separately identified defendant in a lineup.

¶ 18    Balodimas spoke with defendant's mother, Norma Vargas, on June 23, 2009. She said she did not drive defendant to a barbecue on the day of the shooting. The last time she saw defendant was about a week prior to her interview, and she had not seen defendant's brother, Gilberto Luis Vargas, for more than a year.

¶ 19    Balodimas testified that defendant was released from custody on June 24, 2009, without being charged, as the police wanted to locate Gilberto Luis Vargas to determine his whereabouts on the day of the shooting. On August 12, 2009, Gilberto Luis Vargas was arrested in Alabama.

When Balodimas interviewed Gilberto Luis Vargas in Wisconsin on September 17, 2009, his hairstyle was "a very large afro."

¶ 20    Robert C. Reynolds, a United States marshal, testified that on May 14, 2010, he and his team initiated a fugitive investigation for defendant based on information that defendant was wanted on a warrant for a murder in Chicago and may be residing at a motel in Huntsville, Alabama. On May 20, 2010, while surveilling the motel, Reynolds observed a man matching defendant's description leaving in a truck. Reynolds followed the truck to a parking lot, where several local police vehicles surrounded it. The truck's driver, whom Reynolds identified in court as defendant, attempted to flee on foot, but was apprehended and identified by a tattoo on his arm.

¶ 21    Defendant did not testify or present evidence.

¶ 22    The jury found defendant guilty of first degree murder and that he personally discharged a firearm causing Jose's death. The trial court imposed a sentence of 30 years in prison for first degree murder, plus 25 years for personally discharging a firearm, for a total sentence of 55 years.

¶ 23    On direct appeal, defendant contended that the trial court failed to adequately consider his age and family ties as mitigating factors at sentencing. We affirmed. *People v. Vargas*, 2015 IL App (1st) 130189-U.

¶ 24    On October 2, 2015, through private counsel, defendant filed a postconviction petition asserting that it was the driver of the vehicle in which he was riding, Gerardo "G-Man" Gonzalez, who shot and killed Jose. The petition raised two substantive claims: (1) actual innocence based on newly discovered evidence, namely, affidavits executed by Lucas Mercado and Anthony Pitts; and (2) ineffective assistance of trial counsel due to counsel's failure to present available, persuasive evidence of defendant's innocence. Defendant supported his petition with a self-executed affidavit, affidavits from Mercado, Pitts, and Marina Cruz, and an article from a news

website reporting that on October 25, 2009, Gonzalez hanged himself and died in a Chicago police lockup.

¶ 25    Defendant stated in his affidavit that he approached the van on June 20, 2009, and asked the occupants whether they "gangbang." Afterwards, defendant entered Gonzalez's vehicle and Gonzalez pulled beside the van. Defendant tried to persuade Gonzalez that the occupants were not gang members, so he lowered his window and said, "yall [*sic*] don't bang right?" Then, Gonzalez reached across defendant, fired one shot at the van, and drove away. Defendant explained that he gave the police a false alibi because immediately after the shooting, Gonzalez held a gun to his head and threatened to kill him and his family if he told anyone the truth. Defendant stated that when Ortiz met him after the shooting, defendant was telling Gonzalez that Gonzalez "f*** up." Defendant also stated, "Shortly after [Gonzalez] and I parted ways I decided to keep my distance from him."

¶ 26    Defendant averred that while he was in Alabama, he learned through Facebook that Gonzalez had committed suicide. Later, when defendant was in Cook County jail, he was visited by Cruz, who had been Gonzalez's girlfriend. She told defendant that on September 27, 2009, Gonzalez told her that he shot and killed a man in a van at the corner of Western and North, and that the police were looking for defendant, but that defendant "had nothing to do with this murder." Defendant's first trial attorney told defendant that Cruz's information would not help him. Soon afterwards, that attorney retired and defendant's second trial attorney said he would call Cruz as a witness, but failed to do so. Defendant related that after he arrived in prison in 2013, he was approached by Mercado, who informed defendant that he knew Gonzalez and saw him shoot into a van at the corner of Western and North on the day in question. In 2015, defendant met Anthony

Pitts, who said he was friends with Garvin. Pitts related that Garvin told him defendant "wasn't the guy" who killed Jose.

¶ 27    Mercado averred in his affidavit, dated June 9, 2015, that on June 20, 2009, he was standing by an alley near the intersection of Western and North when he saw Gonzalez pull beside a van. Gonzalez reached across a person in the passenger seat, fired a single shot out the vehicle's passenger-side window toward the van, and drove away at a high speed. Mercado did not previously come forward with this information because he was afraid of being a "snitch."

¶ 28    Pitts averred in his affidavit, dated April 21, 2015, that he was friends with Garvin, who once visited him in jail. During the visit, Garvin said he felt guilty about defendant being incarcerated for Jose's murder. Garvin told Pitts defendant was actually innocent of the shooting, as it was the driver of the other vehicle, and not the passenger, who shot into the van.

¶ 29    Cruz averred in her affidavit, dated September 24, 2015, that on September 27, 2009, Gonzalez, with whom she had an intimate relationship, told her he shot and killed a man in a van at North and Western during the Puerto Rican week festival. Gonzalez told Cruz that although defendant was in Gonzalez's vehicle with him, defendant had no knowledge that Gonzalez had a firearm and would shoot the man in the van. Cruz averred that she told "this" to defendant's attorneys and was willing to testify. However, one of defendant's attorneys told her that her testimony would not make a difference and she was never called as a witness.

¶ 30    Defendant argued that Mercado's affidavit constituted newly discovered evidence of actual innocence, since Mercado came forward after defendant's trial and neither defendant nor his attorneys had any reason to be aware of Mercado's existence or that he witnessed the shooting. Defendant further argued that although Pitts's and Cruz's affidavits were "technically hearsay," they fell within the recognized rule that certain inherently reliable statements made against the

declarant's penal interest are admissible. Moreover, defendant asserted that Pitts's affidavit was not offered to prove the matter asserted, but to demonstrate that new impeachment evidence would be available if a new trial were granted.

¶ 31 Regarding his claim of ineffectiveness, defendant argued that although both Cruz's and his own affidavits indicated trial counsel was informed of what Cruz could testify to and that she was ready, willing, and able to testify, counsel did not call her as a witness. Defendant further faulted counsel for not introducing evidence of Gonzalez's suicide, which he asserted showed Gonzalez felt remorse and guilt over the shooting. Defendant argued that there was no strategic reason not to call Cruz, and that he was prejudiced by counsel's failure because, had the jury been presented with evidence of the "remorseful confession to one's paramour followed soon after by a suicide," it could have potentially changed the result of the trial.

¶ 32 The circuit court docketed defendant's petition and the State filed a motion to dismiss. Following a hearing on September 13, 2017, the circuit court granted the State's motion. The court found that defendant had not shown that counsel's representation fell below an objective standard of reasonableness or that defendant had suffered prejudice. As to the actual innocence claim, the court found that the theory in Mercado's affidavit had been presented at trial, that Pitts's affidavit was hearsay, and that no substantial constitutional violation had been shown.

¶ 33 On appeal, defendant contends that his petition made a substantial showing of actual innocence where he presented newly discovered evidence that it was not him, but rather, Gonzalez, who shot and killed Jose.[2]

---

[2] Defendant does not argue his ineffectiveness claim on appeal.

¶ 34     In cases not involving the death penalty, the Act provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq.* (West 2014); *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). The instant case involves the second stage, where defendants are represented by counsel and the State may file a motion to dismiss. *Hodges*, 234 Ill. 2d at 10-11. At this stage, all factual allegations that are not positively rebutted by the record are accepted as true. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). The dismissal of a petition is warranted if its allegations, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). In other words, a defendant is entitled to proceed to a third-stage evidentiary hearing on his petition only if the allegations therein, supported by the trial record and affidavits or exhibits, make a substantial showing of a violation of constitutional rights. *Id.* at 381. Our review at the second stage is *de novo*. *Id.* at 388-89. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 35     A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Id.*; *People v. Coleman*, 2013 IL 113307, ¶ 84. Evidence is considered new where it was discovered after trial and could not have been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The conclusiveness of the evidence is the most important element of an

actual innocence claim. *People v. Edwards*, 2012 IL 111711, ¶ 40 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 36    In this case, we need not address the parties' arguments regarding whether Mercado's and Pitts's potential testimony is newly discovered, material, or noncumulative. This is because defendant fails to meet the requirement that the supporting evidence must be so conclusive that, when considered along with the trial evidence, it would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123, ¶ 47; *Coleman*, 2013 IL 113307, ¶¶ 84, 96. The conclusive-character element requires a petitioner to "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶¶ 1, 56 (explaining the "conclusive-character element" in case involving denial of leave to file successive postconviction petition). In the context of second-stage proceedings, where petitioners are required to make a substantial showing of actual innocence to avoid dismissal, new evidence does not satisfy the conclusive-character requirement if it merely contradicts the testimony of other occurrence witnesses or merely adds conflicting evidence to the evidence adduced at the trial. *Sanders*, 2016 IL 118123, ¶¶ 37, 52-53; see also *Robinson*, 2020 IL 123849, ¶¶ 57-59 (recognizing that the " 'conflicting evidence' standard" applied in second-stage proceedings in *Sanders* and in third-stage proceedings in *Coleman* and *Ortiz*).

¶ 37    Here, defendant argues that the information in Mercado's and Pitts's affidavits is of such conclusive character that it would be reasonably likely to change the outcome upon retrial, especially because information in his own and Cruz's affidavits, though not newly discovered, corroborates his claim of actual innocence. Defendant contends that if the jury had heard from Mercado that he saw Gonzalez shoot Jose, from Pitts that Garvin falsely testified that defendant was the shooter, and from Cruz that Gonzalez confessed to her before his suicide, "confidence in

the outcome of the trial unquestionably would be undermined." Defendant further argues that Yesenia's testimony on cross-examination that she did not see a firearm in defendant's hand and saw him "lean back" before she heard a shot corroborates Mercado's claim that Gonzalez reached across defendant and shot at the minivan. Finally, defendant maintains that while Gonzalez's confession to Cruz is hearsay, admissibility rules do not apply in postconviction proceedings and, at any rate, the confession would be admissible at retrial as a statement against penal interest.

¶ 38    In *Sanders*, the defendant was convicted of first degree murder and aggravated kidnaping based, primarily, on the testimony of three witnesses: Donald Barfield, William Ramseur, and Gary Bingham. *Sanders*, 2016 IL 118123, ¶¶ 1, 4-12. Barfield testified that the defendant was one of three men who held the victim by the arms and tried to get him out of Barfield's house. *Id.* ¶ 5. Ramseur testified that three armed men he did not know took the victim out of Barfield's house and later identified the defendant in a lineup. *Id.* ¶¶ 6, 9. Bingham testified that he and the defendant, both of whom were armed, dragged the victim from Barfield's house and put him in the trunk of a vehicle. *Id.* ¶ 8. At the defendant's direction, Aaron May drove the group to an abandoned building. *Id.* While Bingham and May waited outside, the defendant removed the victim from the trunk, took him into an abandoned building, and shot him twice. *Id.* The pathologist who performed the victim's autopsy testified that the victim was shot twice in the head and the cause of death was multiple gunshot wounds. *Id.* ¶ 4. The defendant testified, denying all involvement, and the defendant's girlfriend testified as to an alibi. *Id.* ¶ 52.

¶ 39    The defendant in *Sanders* eventually filed a successive postconviction petition asserting newly discovered evidence of actual innocence. *Id.* ¶ 14. The petition was supported by, *inter alia*, an affidavit from Patricia DeRamus and a transcript containing excerpts of testimony that Bingham had given three years earlier at an evidentiary hearing on a postconviction petition filed by

codefendant May. *Id.* DeRamus averred that she saw Bingham "march" the victim out of Barfield's house at gunpoint, and that at all times that she observed, Bingham acted alone. *Id.* ¶ 15. In the transcript excerpt, Bingham recanted his testimony identifying May and the defendant as participating in the murder. *Id.* ¶ 16. He stated that he picked up the victim by himself, threw him over his shoulder, carried him outside, and put him in the trunk. *Id.* Alone, he then drove to an abandoned building and shot the victim one time. *Id.*

¶ 40 The circuit court advanced the petition to second-stage proceedings. *Id.* ¶¶ 17-18. The State filed a motion to dismiss, which the circuit court granted. *Id.* ¶ 19. This court affirmed. *Id.* ¶ 20.

¶ 41 Our supreme court affirmed the second-stage dismissal, finding that the defendant failed to make a substantial showing of a claim of actual innocence. *Id.* ¶ 55. The court stated that even assuming Bingham's recantation and DeRamus's affidavit were newly discovered, material, and noncumulative, the evidence was not of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 47. The court observed that Bingham's recantation "conflict[ed] with much of the evidence" at the defendant's trial. *Id.* ¶ 48. For instance, the pathologist had testified that the victim was shot twice, while Bingham stated in his recantation that he shot the victim only once. *Id.* In addition, Ramseur testified that three armed men, one of whom he later identified as the defendant, took the victim from Barfield's house, and Barfield's testimony placed the defendant at the house during the lead-up to the incident and identified the defendant as one of the men involved in getting the victim out of the house. *Id.* ¶¶ 48-49, 51.

¶ 42 The *Sanders* court concluded:

"Thus, Bingham's recantation is contrary not only to his own testimony at petitioner's trial, but also to the testimony of Ramseur and Barfield, who positively identified petitioner as being with Bingham and May at Barfield's house the night of the murder and as having

participated in the events leading up to Cooks'[s] murder. It is also contradicted by the pathologist's testimony that Cooks was shot twice in the head, not once, as Bingham claimed in his recantation. Bingham's recantation testimony merely adds conflicting evidence to the evidence adduced at the trial. Even taking the well-pleaded facts as true, we conclude that the recantation is not of such conclusive character as would probably change the result on retrial.

The same must be said of the factual statements in DeRamus's affidavit. Her statements merely contradict the testimony of other occurrence witnesses. Further, we note that DeRamus's statement that Bingham 'marched' Cooks out the back door of Barfield's house directly contradicts Bingham's recantation testimony when he said that he picked up Cooks, threw him over his shoulder, and took him out the back door. Like Bingham's recantation, DeRamus's proposed testimony would merely add to the evidence the jury heard at petitioner's trial. It is not so conclusive in character as would probably change the result on retrial, either by itself or in conjunction with Bingham's recantation." *Id*. ¶¶ 52-53.

¶ 43    Following *Sanders*, we must examine the record to determine whether the proposed new evidence would merely add conflicting or contrary evidence to the evidence heard at trial, even where, as in *Sanders*, the postconviction evidence includes statements that the defendant was not involved in the crime. *People v. Simms*, 2020 IL App (1st) 161067, ¶ 43 (citing *Sanders*, 2016 IL 118123, ¶ 48). Here, the proposed evidence from Mercado is that he saw Gonzalez pull beside a minivan, reach across a person in his vehicle's passenger seat, and fire a single shot out the vehicle's window toward the minivan. The proposed evidence from Pitts is that Garvin told him

he felt guilty about defendant being incarcerated, as it was the driver of the other vehicle, and not the passenger, who shot into the minivan.

¶ 44    The content of both of these averments is in conflict with and contradicted by direct evidence from the trial testimony of Yesenia, Macias, Olave, Alamo, and Garvin that defendant had a firearm and shot Jose, and circumstantial evidence from Ortiz's testimony that on the evening of the shooting, defendant repeatedly uttered, "I f*** up." Yesenia, Olave, Alamo, and Garvin identified defendant as the shooter in photo arrays, and all five eyewitnesses identified him as the shooter in lineups. At best, Mercado's and Pitts's affidavits "might 'provide a basis to argue the existence of a reasonable doubt,' but that is not the standard for a claim of actual innocence." *Id.* ¶ 44 (quoting *People v. Anderson*, 401 Ill. App. 3d 134, 141 (2010)).

¶ 45    In light of the evidence adduced at trial, Mercado's and Pitts's affidavits are not of such conclusive character as would probably change the result on retrial. Rather, the affidavits "merely add[] conflicting evidence to the evidence adduced at the trial" and "merely contradict the testimony of other occurrence witnesses." *Sanders*, 2016 IL 118123, ¶¶ 52-53; see also *Simms*, 2020 IL App (1st) 161067, ¶ 47. Thus, defendant has failed to carry his burden to make a substantial showing of a claim of actual innocence. *Sanders*, 2016 IL 118123, ¶ 55; *Simms*, 2020 IL App (1st) 161067, ¶ 47. Second-stage dismissal was proper.

¶ 46    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 47    Affirmed.