2022 IL App (1st) 220106-U

FIFTH DIVISION
December 23, 2022

No. 1-22-0106

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 11999 |
| | ) | |
| GILBERTO VARGAS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Connors and Justice Lyle concurred in the judgment.

**ORDER**

*Held***:**  We reverse, in part, the circuit court's denial of defendant's petition for leave to file a successive postconviction petition because the petition set forth a colorable actual innocence claim. We affirm the court's denial of leave for defendant to file his sentencing claim because he could not demonstrate cause for failing to raise the claim in his initial petition.

¶ 1     Defendant Gilberto Vargas appeals from the circuit court's denial of his petition for leave

to file a successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et*

*seq.* (West Supp. 2021)). He contends the court erred regarding two claims—one for actual

innocence, and the other that his sentence is unconstitutional. We reverse the court's ruling regarding the actual innocence claim and remand for further proceedings on that claim, but affirm the court's ruling regarding defendant's sentencing claim.

¶ 2                                    BACKGROUND

¶ 3      In *People v. Vargas*, 2020 IL App (1st) 172568-U, this court recited the facts adduced at trial and those relating to the resolution of defendant's direct appeal and resolved his appeal from the dismissal of his initial postconviction petition. Herein, we update some facts and repeat those which are most relevant to his current claims.

¶ 4      Defendant's conviction arose from the shooting death of Jose Galaviz on June 20, 2009, in Chicago. After his arrest, defendant was charged by indictment with multiple counts of first degree murder, attempt first degree murder, and aggravated discharge of a firearm. The State proceeded on six counts of first degree murder. At defendant's 2012 jury trial, Yesenia Galaviz testified that on the day in question, she and her brother, Jose, gathered with several friends.[1] Early that evening, the group set out in a minivan for the Puerto Rican Day parade in Humboldt Park. Larry Garvin drove, Danny Olave sat in the front passenger seat, Erick Alamo and Jose sat in the middle row, and Jessica Macias and Yesenia sat in the back row. All the minivan's windows were rolled down and both sliding doors were open.

¶ 5      Shortly before 7 p.m., as the group was stopped in southbound traffic on Western Avenue near the intersection with Hirsch Street in Chicago, a man approached the passenger side of the minivan. He was about four feet from Yesenia and nothing obstructed her view of his face. He had a short haircut, "[a]most bald, but not quite." In court, Yesenia identified defendant as this man. Defendant asked Jose if he or anyone in the minivan was a gangbanger. Jose said, "[N]o.

---

[1] Because Jose and Yesenia share a last name, we will refer to them by their first names.

We don't gangbang. We're partying." Defendant responded that they were "cool" and walked back to the corner, where he joined several other men.

¶ 6    Garvin briefly continued driving southbound on Western, but the group decided to go home because the encounter gave them a "bad feeling" that something would happen. As they were waiting on Western to turn left onto North Avenue, a vehicle occupied by two men pulled beside the driver's side of the minivan so that the vehicle's passenger was in-line with Jose. Yesenia recognized the passenger as defendant from his interaction with Jose 10 minutes earlier. Defendant said, "I thought you all don't gangbang" and shot Jose. When Jose leaned forward, Yesenia grabbed him, looked to her left, and made eye contact with defendant. Defendant told the driver of the vehicle to "keep going" and the vehicle drove off. Yesenia pulled Jose into the back row of seats and hit his face repeatedly in an effort to keep him conscious as Garvin drove to St. Elizabeth Hospital.

¶ 7    While at St. Elizabeth Hospital, Yesenia spoke with the police. She told them what happened and provided a description of defendant. At some point, Jose was transferred to Stroger Hospital, where he died. Yesenia spoke with the police at Stroger Hospital and, later that evening, went to the police station. There, she identified defendant in a photo array. On June 23, 2009, she identified him in a lineup.

¶ 8    On cross-examination, Yesenia agreed that she never saw the vehicle's passenger with a firearm, never saw a firearm in his hand, and never saw a firearm extend out of the vehicle's window. When asked, "You saw the passenger lean back and then you heard the shot, right?" she answered affirmatively.

¶ 9    Macias, Olave, Alamo, and Garvin testified to substantially the same events as Yesenia. They agreed that defendant, whom they all identified in court and described as having a short or

3

"low" hairstyle, approached their minivan on foot and asked about gang affiliation. They denied gang affiliation and drove off, but shortly thereafter turned around, and while they were waiting to turn left onto North Avenue, a vehicle pulled beside them. Defendant, who was in the passenger seat, made a comment about gangbanging.

¶ 10    Macias testified that she saw defendant pull out a firearm, point it at Jose, and fire. Olave testified that defendant shot Jose; he specified that he saw a firearm in defendant's hand and heard a "big pop." Alamo stated that he saw defendant draw a firearm and shoot Jose. Garvin testified that he saw defendant raise and point a firearm at Jose, ducked, accelerated, and heard one gunshot. At the police station, Garvin identified defendant from a "bunch of pictures," and Olave and Alamo also testified that they identified defendant in photo arrays. Macias, Olave, Alamo, and Garvin all testified that they later identified defendant in lineups.

¶ 11    Erick Ortiz testified that on June 20, 2009, he saw defendant, who was his cousin's boyfriend, at the corner of Western and Hirsch. Defendant was with two other men, one whom Ortiz did not know, and the other whom he knew as "G-Man." Ortiz joined defendant, who was "looking around, watching people, and just looking at people into cars and stuff like that." Later in the afternoon, defendant and G-Man left the corner and jogged across the street toward a barber shop. After 20 to 30 minutes, Ortiz called defendant. He then went to a friend's house to meet defendant in the gangway. Defendant, who was with G-Man and some other men, said, "I f*** up." Ortiz asked what he meant, but defendant just kept repeating himself.

¶ 12    Chicago police sergeant John Folino testified that on June 22 and 23, 2009, he and a detective who had *Mirandized* defendant had several video- and audio-recorded conversations with defendant while he was in custody. Defendant stated that on the day of the shooting, his son's mother dropped his son off at his house. He and his son were inside all day because his son

had a "double ear infection." Then, around 7 p.m., defendant's mother dropped him and his son off at a barbeque at a friend's house, where they stayed until 10 or 11 p.m.

¶ 13   Patricia Sasso, the mother of defendant's son, testified that on the day of the shooting, she went to the Puerto Rican Day festival and left their son at home with her other child's grandmother. Sasso stated that she did not drop their son off at defendant's house and that defendant had no contact with him that day. She also denied that their son had a double ear infection.

¶ 14   Chicago police detective Demosthenes Balodimas testified that he responded to St. Elizabeth Hospital. There, he spoke with Yesenia, Garvin, Macias, Olave, and Alamo, and received a description of the shooter. Early the next morning, the witnesses went to the police station. Garvin identified defendant as the shooter from a "pile" of 29 photos. Then, Yesenia, Olave, and Alamo identified defendant in separate six-person photo arrays. On June 23, 2009, Yesenia, Garvin, Macias, Olave, and Alamo returned to the police station and each separately identified defendant in a lineup.

¶ 15   Balodimas spoke with defendant's mother, Norma Vargas, on June 23, 2009. She said she did not drive defendant to a barbecue on the day of the shooting. The last time she saw him was about a week before her interview.

¶ 16   On cross-examination, Balodimas admitted that Macias did not report to him that the shooter was the same individual who had approached the group earlier, and could not identify defendant in a photo array.

¶ 17   Defendant did not testify or present evidence. The jury found defendant guilty of first degree murder and that he personally discharged a firearm causing Jose's death.

¶ 18    Defendant's pre-sentence investigation report (PSI) indicated his highest education level was eighth grade, from which he graduated while incarcerated. He was single but had two children. Defendant belonged to the Spanish Cobras gang. His father had little involvement in his upbringing, but defendant did not suffer physical, sexual, or mental abuse, and he denied having alcohol or drug problems.

¶ 19    At sentencing, defense counsel argued defendant was "young and immature" at the time of the offense. The circuit court imposed a sentence of 30 years in prison for first degree murder, plus 25 years for personally discharging a firearm, for a total sentence of 55 years.

¶ 20    On direct appeal, defendant contended that the circuit court failed to adequately consider his age and family ties as mitigating factors at sentencing. This court affirmed. *People v. Vargas*, 2015 IL App (1st) 130189-U.

¶ 21    On October 2, 2015, through private counsel, defendant filed a postconviction petition asserting that Gerardo "G-Man" Gonzalez, the driver of the vehicle, shot and killed Jose. Defendant claimed, in relevant part, actual innocence based on newly discovered evidence, and supported his petition with a self-executed affidavit, affidavits from Lucas Mercado, Anthony Pitts, and Marina Cruz, and an article from a news website reporting that on October 25, 2009, Gonzalez hanged himself and died in a Chicago police lockup.

¶ 22    Defendant stated in his affidavit that he approached the van on June 20, 2009, and asked the occupants whether they "gangbang." Afterwards, defendant entered Gonzalez's vehicle and Gonzalez pulled beside the van. Defendant tried to persuade Gonzalez that the occupants were not gang members, so he lowered his window and said, "yall [*sic*] don't bang right?" Then, Gonzalez reached across defendant, fired one shot at the van, and drove away. Defendant explained that he gave the police a false alibi because immediately after the shooting, Gonzalez

held a firearm to his head and threatened to kill him and his family if he told anyone the truth. Defendant stated that when Ortiz met him after the shooting, defendant was telling Gonzalez that Gonzalez "f*** up." Defendant also stated, "Shortly after [Gonzalez] and I parted ways I decided to keep my distance from him."

¶ 23    Mercado stated in his affidavit, dated June 9, 2015, that on June 20, 2009, he was standing by an alley near the intersection of Western and North when he saw Gonzalez pull beside a van. Gonzalez reached across a person in the passenger seat, fired a single shot out of the vehicle's passenger-side window toward the van, and drove away at a high speed. Mercado did not previously come forward with this information because he feared being a "snitch."

¶ 24    Pitts stated in his affidavit, dated April 21, 2015, that he was friends with Garvin, who once visited him in jail. During the visit, Garvin said he felt guilty about defendant being incarcerated for Jose's murder. Garvin told Pitts defendant was innocent of the shooting, as it was the driver of the other vehicle who shot into the van.

¶ 25    Cruz stated in her affidavit, dated September 24, 2015, that on September 27, 2009, Gonzalez, with whom she had an intimate relationship, told her he shot and killed a man in a van at North and Western during the Puerto Rican week festival. Gonzalez told Cruz that although defendant was in Gonzalez's vehicle with him, defendant had no knowledge that Gonzalez had a firearm and would shoot the man in the van.

¶ 26    The circuit court granted the State's motion to dismiss the petition at the second stage. This court affirmed. *People v. Vargas*, 2020 IL App (1st) 172568-U.

¶ 27    On September 9, 2021, defendant filed a *pro se* petition for leave to file a successive postconviction petition. In the petition, defendant, in relevant part, claimed actual innocence and

that his sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11).

¶ 28    To support his actual innocence claim, defendant attached affidavits from Garvin (dated March 15, 2021), Olave (April 10, 2021), Ortiz (August 14, 2020), and Jennifer Morales (August 14, 2020). Defendant claimed each affidavit was unavailable at the time of trial. In their affidavits, Garvin, Olave, and Ortiz each retracted their trial testimony, and claimed they only testified against defendant because Balodimas coerced them. Garvin and Olave now claimed that Gonzalez, not defendant, was the actual shooter, while Ortiz stated that defendant never said, "I f*** up." Defendant also attached to the petition information regarding other cases where Balodimas allegedly coerced false testimony or testified falsely himself.

¶ 29    Morales, the mother of defendant's child, stated in her affidavit that she told Balodimas she heard Gonzalez confess, but Balodimas threatened her to testify against defendant, or Balodimas would imprison her and she would lose her child. Morales further stated that she interacted with Gonzalez in the police station, who said that he had already confessed he was the shooter.

¶ 30    Defendant also attached the previous affidavits of Mercado, Pitts, and Cruz, along his own affidavit, in which he claimed he had no prior knowledge that Gonzalez had a firearm or planned to shoot Jose.

¶ 31    Defendant also argued that his 55-year sentence constituted a *de facto* life sentence under *People v. Buffer*, 2019 IL 122327, and thus violated the proportionate penalty clause as applied to him because his brain development was more akin to that of a juvenile at the time of the offense. Specifically, defendant claimed that his father abused him and his mother, then abandoned the family home; his living conditions as a child were poor; and he was forcefully

inducted into the Spanish Cobras when he was 12 years old because the gang threatened to kill his mother and brother if he did not join. Defendant further contended that he began abusing drugs and alcohol at the age of 10. He claimed these circumstances affected his development, leaving him with "incomplete brain maturation," and that "at the time of the offense" his maturity was "that of a juvenile." Defendant attached law review articles and scientific studies regarding brain development in young adults to the petition.

¶ 32    On December 15, 2021, the circuit court denied defendant leave to file his successive petition. In its written order, the court stated, in relevant part, that defendant's actual innocence claim failed because the argument that defendant was not the shooter was available at the time of trial, recantation testimony is untrustworthy, and the allegations that Balodimas coerced testimony were immaterial. The court further explained that the affidavits were not conclusive because multiple witnesses besides Olave and Garvin testified at trial that defendant was the shooter. The court stated that *res judicata* barred the proportionate penalty clause claim because defendant challenged his sentence on direct appeal, and even if was not barred, the claim lacked merit because the sentencing court appropriately considered and weighed the relevant factors in aggravation and mitigation. Defendant timely appealed.

¶ 33                                                    ANALYSIS

¶ 34    On appeal, defendant first claims the circuit court erred by denying him leave to file his successive postconviction petition because the petition set forth a viable claim of actual innocence.

¶ 35    The Act provides criminal defendants a mechanism to challenge a conviction on the grounds that it violates their constitutional rights. *People v. Robinson*, 2020 IL 123849, ¶ 42. A defendant may file only one petition as of right, and must receive leave from the circuit court to

file successive petitions. 725 ILCS 5/122-1(f) (West Supp. 2021). Leave is appropriate under two circumstances: (1) the defendant can demonstrate cause for not raising the claim earlier, and prejudice should he not be permitted to pursue the claim, and (2) the defendant can demonstrate a colorable claim of actual innocence. *Robinson*, 2020 IL 123849, ¶ 42. A petition for leave to file a successive postconviction petition is reviewed using a higher standard than initial postconviction petitions, which must only raise claims that are not frivolous or patently lack merit. *People v. Edwards*, 2012 IL 111711, ¶¶ 24-29.

¶ 36     A defendant need not show cause and prejudice to state a colorable claim of actual innocence. *People v. Taliani*, 2021 IL 125891, ¶ 58. Instead, the defendant must show that the evidence at issue is (1) newly discovered, (2) material and noncumulative, and (3) conclusive. *Id.* Conclusiveness is the most important element. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is newly discovered if it is discovered post-trial, and could not have been discovered earlier through due diligence. *Id.* "Evidence is material if it is relevant and probative of the petitioner's innocence." *Id.* Evidence is non-cumulative if it "adds to the information that the fact finder heard at trial." *Id.* To establish conclusiveness, the defendant must show that the new evidence, considered alongside the trial evidence, would probably lead to a different result at retrial. *Id.* The new evidence need not be entirely dispositive, as, "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *People v. Coleman*, 2013 IL 113307, ¶ 97. The credibility of newly discovered evidence is not considered at the leave to file stage. *People v. Sanders*, 2016 IL 118123, ¶ 42. We review a court's denial of leave to file a successive postconviction petition *de novo*. *Taliani*, 2021 IL 125891, ¶ 52.

¶ 37    Defendant claimed actual innocence in his initial postconviction petition based on the newly discovered evidence of affidavits from Mercado, Pitts, and Cruz. Here, he again claims actual innocence, based on the additional affidavits of Garvin, Olave, and Ortiz, alongside his own affidavit, and the affidavits from his initial petition (defendant admits in his reply brief that Morales' affidavit is irrelevant to his actual innocence claim).

¶ 38    Defendant contends that the affidavits of Garvin, Olave, and Ortiz are newly discovered evidence because as recantations of trial testimony, the evidence was necessarily unavailable at trial. The State responds that defendant has failed to demonstrate the recantations of Garvin, Olave, and Ortiz were not available earlier through due diligence.

¶ 39    First, we note that defendant's own affidavit cannot be considered newly discovered because the information therein, specifically that defendant did not know Gonzalez had a firearm and intended to shoot Jose, was information known to defendant before trial. See *Robinson*, 2020 IL 123849, ¶ 53. Thus, we cannot consider his affidavit when analyzing his actual innocence claim.

¶ 40    Respecting Garvin, Olave, and Ortiz's affidavits, however, we find that defendant has demonstrated that the affidavits are "newly discovered" for purposes of his actual innocence claim. As the court in *People v. Harper*, 2013 IL App (1st) 102181, explained in addressing whether a recantation affidavit from a trial witness was newly discovered evidence, "Clearly, due diligence could not have compelled [the witness] to testify truthfully at the first trial." *Harper*, 2013 IL App (1st) 102181, ¶ 42. In *Harper*, the recanting witness claimed that "his trial testimony was a lie and that police officers threatened him to obtain the testimony." *Id.* Similarly, here, defendant could not have known before trial of the alleged coercion by Balodimas, and the role that coercion played in procuring Garvin's, Olave's and Ortiz's trial

11

testimony. See *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 134 (in the context of a newly discovered evidence analysis for an actual innocence claim, the due diligence requirement "applies to the diligence shown before trial").

¶ 41    Next, the State concedes that the affidavits of Garvin and Olave are material and non-cumulative, but contends Ortiz's affidavit is immaterial because he did not witness the shooting itself. We disagree, and find Ortiz's testimony to be material and non-cumulative. Ortiz's trial testimony was that defendant repeatedly stated "I f*** up" when Ortiz saw him shortly after the shooting, with the implication that defendant was demonstrating regret for shooting Jose. Ortiz's affidavit now claims that defendant said that *Gonzalez* "f*** up," with the implication now switching to defendant chastising Gonzalez for the shooting. Should the jury accept this evidence, it would be relevant to support defendant's theory that Gonzalez was the shooter. Additionally, the jury did not hear any evidence at trial contending that it was Gonzalez, and not defendant, who was the shooter, making Ortiz's new testimony non-cumulative.

¶ 42    Finally, we find that the new evidence as described in Garvin, Olave, and Ortiz's affidavits, if accepted as true by the jury, could change the result at trial such that defendant has satisfied his conclusiveness showing at this stage. See *Robinson*, 2020 IL 123849, ¶ 60. Garvin and Olave identify Gonzalez as the shooter, and Ortiz's affidavit claims that defendant stated that Gonzalez "f*** up" shortly after the shooting. Additionally, as defendant argues, there is no confession or physical evidence linking defendant to the shooting. Should the jury accept this testimony, along with the contention that Balodimas coerced Garvin and Olave into identifying defendant as the shooter, the jury could credit the affiants' version over that of the other eyewitnesses and acquit defendant on the theory Gonzalez was the shooter.

¶ 43    The State argues that the affidavits are not sufficiently conclusive because they do not defeat defendant's guilt via an accountability theory. Our supreme court in *Robinson*, however, considered and rejected this same argument from the State. *Id.* ¶ 75. In *Robinson*, the court rejected the argument as "entirely without merit" because "the State never introduced an accountability theory into the case." The same is true here; the State never wavered from the theory that defendant was the shooter, and as such, factoring in an accountability theory to determine how a hypothetical jury would weigh the new evidence alongside the existing trial evidence is improper.

¶ 44    The State also argues that the testimony of the other van occupants and eyewitnesses, Macias, Alamo, and Yesenia, remains unrecanted, and thus the affidavits are insufficient to establish a probability of a different result at retrial. Balancing the weight of their testimony against the new hypothetical testimony of Garvin and Olave, however, would require us to assess Garvin and Olave's credibility. Such an assessment is improper at this stage, and should only occur at the third stage of postconviction review at an evidentiary hearing. *Id.* ¶ 61. Here, we must assume a jury *would* accept Garvin and Olave's version of events as true and credible; given that circumstance, the potential for the newly discovered evidence to change the result at trial is clear. See *Id.* ¶ 60. This also negates the State's argument that Garvin's affidavit should be discounted because it is inconsistent with Pitts' statement of Garvin's motive for testifying falsely at trial; any contradiction could affect the credibility of Garvin's affidavit at an evidentiary hearing, but at this stage, Garvin's version must be accepted as true. Accordingly, the circuit court erred in dismissing the actual innocence claim in the successive post-conviction petition, and we remand for second stage proceedings on that claim.

¶ 45 Our decision that defendant's actual innocence claim should go forward does not conclude our review here, however, because the circuit court had to apply a different standard to determine whether to grant defendant leave to file his sentencing claim. As mentioned above, for the circuit court to grant a defendant leave to file a claim in a successive postconviction petition (outside of an actual innocence claim), that defendant must establish cause as to why he did not include the claim in his initial postconviction petition, and prejudice should he be denied the chance to pursue the claim. *People v. Dorsey*, 2021 IL 123010, ¶ 32. "[A] petitioner must establish cause and prejudice as to each individual claim asserted in a successive petition." *People v. Pitsonbarger*, 205 Ill. 2d 444, 463 (2002); see also *People v. Woods*, 2020 IL App (1st) 163031.

¶ 46 To establish cause, the defendant must identify an "objective factor that impeded the ability to raise a specific claim during the initial postconviction proceeding." *Id.* Again, we review a circuit court's denial of leave to file a successive postconviction petition *de novo*, and additionally, we may affirm the court's denial on any basis supported by the record, regardless of the court's reasoning. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010).

¶ 47 Defendant here argues his 55-year sentence constitutes an unconstitutional *de facto* life sentence in violation of principles derived from *Miller v. Alabama*, 567 U.S. 460 (2012), *People v. Harris*, 2018 IL 121932, and *People v. Buffer*, 2019 IL 122327. In *Miller*, the United States Supreme Court held that mandatory life sentences without the possibility of parole for juvenile offenders violated the eighth amendment to the United States Constitution. *Miller*, 567 U.S. at 479. In *Harris*, the Illinois Supreme Court explained that while *Miller* itself only applied to juveniles, its reasoning could be applied to young adult offenders who establish that their brain development was akin to that of a juvenile via a claim based on the proportionate penalties

clause of the Illinois Constitution. *Harris*, 2018 IL 121932, ¶¶ 34-48. Finally, in *Buffer*, the Illinois Supreme Court found that a sentence of longer than 40 years constituted a *de facto* life sentence for juvenile offenders. *Buffer*, 2019 IL 122327, ¶ 41.

¶ 48    Defendant claims he can establish cause for not raising this claim in his initial postconviction petition because a claim under the proportionate penalty clause, derived from *Miller* as applied to him by *Harris* and *Buffer*, arises from case law that post-dates his initial postconviction petition. The State responds that the fact that defendant's initial petition pre-dated *Miller* and its progeny does not provide cause for purposes of a successive postconviction petition, citing *Dorsey*. In *Dorsey*, where the defendant was 14 years old, the Illinois Supreme Court stated that, "we find that *Miller's* announcement of a new substantive rule under the eighth amendment does not provide cause [for purposes of a petition for leave to file a successive postconviction petition] for a defendant to raise a claim under the proportionate penalties clause," reasoning that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Dorsey*, 2021 IL 123010, ¶ 74. Reviewing courts have applied *Dorsey* to find young adult defendants could not rely on the unavailability of the *Miller/Harris* framework at the time of their initial postconviction petitions to establish cause for purposes of obtaining leave to file a successive petition. See *People v. Walker*, 2022 IL App (1st) 201151, ¶ 30.

¶ 49    Based on *Dorsey* and its subsequent application by this court as explained above, we find that defendant here has not established cause for not raising his proportionate penalties claim in his initial postconviction petition because he relies solely on the fact that his initial petition pre-dated *Miller* and its progeny. As the *Walker* court stated, "If *Miller's* announcement of a new substantive rule does not provide a minor cause to bring a successive petition, it follows that

[*Harris* and its progeny] \*\*\* does not provide cause for a young adult's successive petition either." *Walker*, 2022 IL App (1st) 201151, ¶ 29. While the circuit court did not discuss this issue, but we may affirm its decision on any basis supported by the record. *Anderson*, 401 Ill. App. 3d at 138.

¶ 50   Defendant argues that certain panels of this court have previously found that the *Miller/Harris* framework's unavailability at the time of an initial petition established cause. However, this court has previously distinguished these holdings, reasoning that the panels that have allowed such claims only did so when the State conceded cause; however, "when cause has been fully litigated \*\*\* this court has universally applied the holding in *Dorsey* to conclude that cause has not been established based on the prior unavailability of *Miller* and its progeny." *People v. Walsh*, 2022 IL App (1st) 210786, ¶¶ 32-33 (contrasting the case with *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 122, amongst other matters, where the State conceded cause). The State contests cause here.

¶ 51   Defendant also argues that the *Dorsey* language at issue was *obiter dictum*, and thus need not be followed by this court. A different panel of this court addressed and rejected this same argument, on the basis that we must follow the supreme court's *obiter dictum* as precedential unless erroneous. See *People v. Winters*, 2021 IL App (1st) 191625-U, ¶ 51 (citing *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993)). We agree with this reasoning, and follow it here.

¶ 52   Finally, because we find defendant cannot establish cause, we need not resolve whether his petition demonstrated prejudice.

¶ 53                                    CONCLUSION

¶ 54   Defendant's petition set forth a colorable claim of actual innocence, and as such, the circuit court erred by denying him leave to file his successive petition to pursue that claim. The

court correctly denied leave regarding the sentencing claim, however, because defendant cannot establish cause for not raising it in his initial petition. Accordingly, we remand for second stage proceedings on the actual innocence claim alone.

¶ 55    Affirmed in part; reversed and remanded with instructions in part.